AUG 27 2018

ORIGINAL

Approved: _____
Vladislav Vainberg/Justin V. Rodriguez/Martin Bell
Assistant United States Attorneys

Before:    THE HONORABLE BARBARA MOSES
           United States Magistrate Judge
           Southern District of New York

**18 MAG 7370**

- - - - - - - - - - - - - - - - - - x

                                     :    SEALED COMPLAINT

UNITED STATES OF AMERICA             :
                                          Violation of 18 U.S.C.
        - v. -                       :    § 1349.

JAMES MOORE,                         :    COUNTY OF OFFENSE:
                                          NEW YORK
                Defendant.           :

- - - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

        ANGELA TASSONE, being duly sworn, deposes and says that she is
a Special Agent with the Federal Bureau of Investigation ("FBI")
and charges as follows:

**COUNT ONE**
(Conspiracy to Commit Wire Fraud)

        1.    From at least in or about 2015 through at least in or
about 2016, in the Southern District of New York and elsewhere,
JAMES MOORE, the defendant, and others known and unknown, willfully
and knowingly, did combine, conspire, confederate, and agree
together and with each other to commit wire fraud, in violation of
Title 18, United States Code, Section 1343.

        2.    It was a part and object of the conspiracy that JAMES
MOORE, the defendant, and others known and unknown, willfully and
knowingly, having devised and intending to devise a scheme and
artifice to defraud and for obtaining money and property by means
of false and fraudulent pretenses, representations, and promises,
would and did transmit and cause to be transmitted by means of
wire, radio, and television communications in interstate and
foreign commerce, writings, signs, signals, pictures, and sounds
for the purpose of executing such scheme and artifice, to wit,
MOORE engaged in a scheme to defraud victims by soliciting funds
through material misrepresentations for, among other things, equity

and lease investments in a company called Bar Works Inc. ("Bar Works") and related entities.

(Title 18, United States Code, Section 1349.)

The bases for deponent's knowledge and for the foregoing charges are, in part, as follows:

3.     I am a Special Agent with the FBI and am one of the law enforcement agents with primary responsibility for this investigation.  I have been a Special Agent with the FBI since 2014.  I am currently assigned to a squad responsible for investigating wire fraud, bank fraud, securities fraud, money laundering, and other white-collar offenses.  As part of my work at the FBI, I have received training regarding securities fraud and white collar crimes.  The information contained in this affidavit is based upon my personal knowledge, as well as information obtained during this investigation, directly or indirectly, from other sources and agents, including documents and information provided to me by representatives of the U.S. Securities and Exchange Commission ("SEC"), documents provided by financial institutions and investors, interviews of witnesses, including investors and former employees of Bar Works, and my examination of reports and records.  Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation.  Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.  Where dates, figures, and calculations are set forth herein, they are approximate.

THE DEFENDANT AND RELEVANT ENTITIES

4.     JAMES MOORE, the defendant, is a citizen of the United Kingdom who currently resides in Florida.

5.     Renwick Haddow is a citizen of the United Kingdom who principally resided in New York, New York from at least in or about October 2014 through June 2017.  On June 29, 2017, Haddow was charged in a Complaint under the docket number 17 Mag. 4939 (S.D.N.Y.) with one substantive count of wire fraud arising out of the Bar Works scheme described herein (the "Haddow Complaint").  Haddow was detained in Morocco on or about July 26, 2017 and extradited to the United States on or about April 12, 2018.

6.     Based on my review of United Kingdom court records and online reports, I have learned the following:

2

a.    In or about November 2008, the Companies
Investigation Branch of the Insolvency Service of the United
Kingdom ("CIB"), an agency responsible for investigating serious
corporate abuse in the United Kingdom (the "U.K."), disqualified
Renwick Haddow from serving as a director of any company registered
in the U.K. for a period of eight years, through about November
2016.   According to an online press release published by a U.K.
government and public sector news service in or about December
2008, Haddow had served as a director of a failed U.K. company
whose investors lost all or substantially all of their investments.
As set forth in the release, as part of his disqualification,
Haddow consented to a schedule of unfit conduct that stated, in
part and substance, that Haddow caused or allowed the now-insolvent
company to make various misleading statements about its financial
position and prospects.

b.    In July 2013, the U.K.'s Financial Conduct Authority
("FCA") brought a civil action against Haddow and others for
allegedly running various unauthorized collective investment
schemes, including a scheme involving African land ventures, that
raised £16.9 million in funds through, among other things,
misleading statements to investors.

c.    In February 2014, the High Court of Justice,
Chancery Division, ruled, in substance, that the schemes at issue
were in fact unauthorized collective investment schemes.   The
ruling was publicized in the British press.

d.    In March 2015, the British Court of Appeal dismissed
the appeals filed by Haddow and others.  The ruling was publicized
online.

Bar Works

7.    Based on my review of corporate, banking, and tax
records, among other things, I have learned the following:

a.    At all relevant times, Bar Works was a Delaware
corporation that was principally owned and controlled by Haddow.
Bar Works' principal place of business was in New York, New York at
all relevant times. Bar Works was incorporated on or about July 24,
2015.  On or about July 29, 2015, Haddow bought all 20 million
shares of Bar Works for $2,000.  According to Bar Works offering
materials, Bar Works purported to be a company that adapted former
restaurant, bar premises, and other locations into co-working
spaces with "workspaces" for rent to the public in exchange for a
membership fee.

3

b.   In 2015 and 2016, Haddow opened at least four bank accounts in Bar Works's name, designating himself as the sole authorized signatory on each account through account opening forms or resolutions.  The accounts were opened on or about August 5, 2015 at Wells Fargo, December 24, 2015 at Chase, December 29, 2015 at Citibank, and February 16, 2016 at Chase.  The Citibank opening forms represented that Haddow owned 100% of Bar Works.

c.   On or about February 5, 2016, Haddow signed Bar Works' annual Delaware franchise tax report, listing himself as president of Bar Works and its only stated officer and director.

### OVERVIEW OF THE SCHEME TO DEFRAUD INVESTORS OF BAR WORKS

8.   Based on my investigation to date, there is probable cause to believe that JAMES MOORE, the defendant, solicited, and assisted Renwick Haddow in soliciting, investments in Bar Works leases through the use of material misrepresentations about, among other things, the management and operations of Bar Works. As MOORE and Haddow well knew, the FCA's civil action against Haddow for operating unauthorized investment schemes was well publicized as of 2015.  MOORE and Haddow also knew that knowledge of Haddow's control over Bar Works would be material to investors in Bar Works. MOORE and Haddow recruited agents to sell workspace leases in Bar Works and provided them with offering documents and other information that concealed Haddow's control and ownership interests in Bar Works, and affirmatively misrepresented that a non-existent individual named "Jonathan Black" was instead the CEO of Bar Works. MOORE obtained over $1.4 million in exchange for his participation in this scheme.

### THE SCHEME TO DEFRAUD

9.   I have reviewed a copy of a press release dated September 8, 2015 (the "September 2015 Press Release"), in which Bar Works claimed to be "a new venture in the work space market, aiming to bring real vibrancy to the flexible working scene by adding full-service work spaces to former bar and restaurant premises in central city locations."

10.   The September 2015 Press Release announced that in October 2015, Bar Works expected to open its first location, at 47 West 39th Street in New York, New York, which would "offer up to 200 work units, plus meeting and networking areas."

11.   The September 2015 Press Release claimed that Bar Works would earn revenue by "charg[ing] a flat monthly fee to users of [its] work spaces" — customers such as "entrepreneurs, freelancers,

and travelling employees" who wanted a workspace outside their homes – through monthly membership fees that included not only regular access to a workspace but also services such as internet access, photocopying, coffee, "[h]eavily discounted" alcoholic drinks, and technical support.

12.   Based on my review of Bar Works documents, as well as my conversations with former Bar Works employees and agents, among other things, I have learned the following:

a.   From approximately October 2015 through at least April 2017, Bar Works raised funds from investors, among other ways, by selling "leases" coupled with "sub-leases" on individual workspaces in different Bar Works locations, including at least six locations in New York City.

b.   To purchase a lease on a single workspace, investors paid a purchase price generally ranging from $22,000 to $30,000. Investors would then generally "sub-lease" their workspaces to a Bar Works affiliate.

c.   Bar Works or its affiliate typically agreed to pay each investor at least a designated monthly "rental" fee for the lease's duration, generally between 14% and 16% of the investor's investment, regardless of whether a paying customer could be obtained for the investor's workspaces – that is, whether Bar Works received some or no revenue on the relevant workspaces.

d.   Bar Works or its affiliate also generally promised to pay each investor back at least 100% of the purchase price for the corresponding lease at the end of the lease's term, usually ten years, or earlier in certain circumstances.

e.   Investors were also typically offered some additional profit if Bar Works succeeded in increasing the price it charged a customer on the investor's workspace.

13.   Based on my review of Bar Works documents, banking records as well as other financial records and analyses, emails, and my interviews of former Bar Works employees and agents, among other things, I have learned that:

a.   Bar Works provided potential investors with various offering documents, the content and dissemination of which Haddow controlled.

b.   Various Bar Works offering materials and leases distributed between at least about September 2015 and January

5

2017 identified Bar Works' CEO as "Jonathan Black."  These materials, frequently signed by "Jonathan Black," often described Black's purported experience as "finance director/financial controller of two chains of Bars in the UK (Regent Inns PLC – market value US$400m)" and touted his role in setting up "a number of new ventures, including recently 'Car Share,' a car sharing App."

   c. I have also reviewed Bar Works leases with investors that were endorsed by "Jonathan Black" as CEO of Bar Works or its affiliates, including a particular lease signed by "Jonathan Black" as CEO of Bar Works Management Inc. on January 13, 2017.

   d. "Jonathan Black," however, was a fictitious identity adopted by Haddow to conceal his involvement in Bar Works as its incorporator and president.  The Bar Works offering materials omitted Haddow's name entirely.

   14. On or about August 11, 2016, JAMES MOORE, the defendant, with his counsel present, was telephonically interviewed by staff of the United States Securities and Exchange Commission (the "SEC") on a voluntary basis (the "SEC Interview").  Based on my review of the transcript of the SEC Interview, I have learned that MOORE made the following statements, in part and substance:

   a. MOORE first met Haddow in or about 2010 or 2011. Moore later learned that Haddow had set up a network of sales agents around the world to sell investments into an African land venture.

   b. MOORE met with Haddow in or about the middle of 2015 to propose selling MOORE's own real-estate based investment product through Haddow's network of agents.  MOORE also had his own relationship with a master agent company ("Agent Company-1") who had access to sales agents to sell investments.

   c. In subsequent conversations in or about 2015, Haddow proposed that MOORE join him instead to recruit agents to sell workspace leases for a new business called Bar Works.  MOORE learned that the Bar Works business was in New York.  MOORE and his wife met Haddow in person for dinner at at a hotel located in the Soho area of Manhattan in New York City to discuss joining him to promote Bar Works.

   d. In 2015, MOORE agreed to recruit agents to sell Bar Works.  MOORE understood from Haddow that the master agent would be paid a total of 30% of the investments brought in by agents

6

underneath that master agent, and that MOORE would be paid an
additional significant commission on the balance of the remaining
money.

        e.    MOORE recruited Agent Company-1 to bring in
individual agents to sell Bar Works leases to investors.  Agent
Company-1 successfully sold Bar Works workspace leases, including
approximately $300,000 in workspace leases to a particular
investor.

        f.    During the course of his promotion of Bar Works to
agents, MOORE visited three Bar Works locations in New York.

        g.    MOORE used a particular e-mail address when working
with Bar Works ("Moore Address-1").

        h.    MOORE was not paid all of the money he believed he
was owed by Haddow, and MOORE's relationship with Haddow broke down
prior to August 2016.  Nonetheless, MOORE admitted that he received
over $1.4 million in commissions from Haddow for his assistance to
promote Bar Works.

        i.    MOORE never talked to or met Jonathan Black.

    15.    Based on my interview of an employee of Bar Works
("Employee-1") who worked in various capacities for the company
between at least about March 2016 and May 2017, including as the
company's "CEO" and "Managing Director" in charge of day-to-day
operations, I have learned that in or before August 2016,
Renwick Haddow admitted to Employee-1 that he was "Jonathan
Black."

    16.    Based on my participation in this investigation and
review of emails, I know that Haddow adopted the "Jonathan
Black" identity in communications with third parties regarding
Bar Works, including through the email account
jonathan.black@barworks.com.

    17.    For the reasons stated below, there is probable cause to
believe that JAMES MOORE, the defendant, made misrepresentations,
and assisted Haddow in making misrepresentations, about Haddow's
control over Bar Works, and the existence of the fictitious
Jonathan Black, among other things.

    18.    Based on my review of emails, including those of JAMES
MOORE, the defendant, through Moore Address-1, and Renwick Haddow,
I have learned the following, among other things:

a.    In approximately September 2015, MOORE introduced Agent Company-1 to Bar Works and began facilitating Agent Company-1's sales of workspace leases to investors.

b.    On September 21, 2015, MOORE sent an email to the Agent Company-1's chief operating officer and asked: "Can we make a plan to get some marketing started for this ASAP? I think with the incredible materials they have . . . we can answer any and all questions anyone may have. All we need now is . . . Wait for it . . . Leads!" Agent Company-1's chief operating officer asked for specific documentation and raised a concern about the need for "some sort of track record from the developer [Bar Works] of what they have done previously." MOORE forwarded the email to Haddow for a response. Haddow then replied to MOORE: "Bullshit. They need to overcome this one. It won't even be an issue."

c.    On or about November 5, 2015, MOORE emailed HADDOW at renwick@renwickhaddow.com the text of a proposed letter MOORE wanted to be issued by Jonathan Black.  MOORE wrote to Haddow, "Mate see what you think to this please and if its ok lets get it on a headed paper.. as a pdf." The letter stated, in part:

> I am the CEO of Barworks Inc., and am making this statement under the same legal and regulatory guidelines under which I have made various statements within the company's Reg S share offer document. Barworks Inc business smodel, currently offers leases to investors on workspaces at various co working locations in USA and soon to be elsewhere. For the avoidance of doubt, each co working location will have a designated number of workspaces.  This will be the maximum number of leases that will be offered to investors per location AT ANY TIME. . . . In the case of the company's first outlet, (address) the total number of workspaces envisaged and planned at this location is 105 (including mezzanine and basement private work areas) of which no more than 65 will be offered to investors. . . . Jonathan Black CEO – 11/5/15[.]

d.    On or about November 16, 2015, MOORE asked Haddow's assistant over e-mail to create a letter on Bar Works stationery signed by "Jonathan Black Chief Executive Officer" confirming that a particular agent company was an authorized agent of Bar Works. The assistant forwarded the request to Haddow for approval. In a reply that went to both the assistant and MOORE, Haddow, using the address renwick@renwickhaddow.com, authorized the creation of this Jonathan Black letter.

        e.    In or about January 2016, MOORE and Haddow
successfully recruited an agent ("Agent-1") to sell Bar Works
leases to investors in China.  After posing a number of due
diligence questions to "Jonathan Black," Agent-1 emailed MOORE and
"Jonathan Black" at jonathan.black@barworks.nyc a question about
the rationale for a guaranteed 125% return of capital to investors
after ten years.  On or about January 13, 2016, MOORE forwarded the
email to Haddow at renwick@renwickhaddow.com, with the following
note: "[t]his twat is a lot more civil now.  Can we please send him
hi res pics for brochure 2 (the Times Square prospectus)[?]  And
how does Jonathan want to explain the buyback rationale to him?"

        f.    On or about February 11, 2016, MOORE sent an email
promoting the opportunity to sell Bar Works to a potential agent
("Agent-2"), copying among others, Haddow's Jonathan Black email
address (jonathan.black@barworks.nyc).  MOORE described "Jonathan
Black" in part as "the primary originator of barworks prior to us
becoming involved (at the formation stage) with this small and
tight team who were previously responsible for successful rollout
of walkabout bars in uk." MOORE also assured Agent-2, in part and
substance: "We are comfortable that our business model is compliant
with any and all required regulations . . . our lawyers in USA are
of high standing and happy to defend the validity and legality of
the product if/as/when necessary[.]"

        g.    On or about March 3, 2016, MOORE forwarded Haddow
and another associate a request from Agent-2 to meet with Jonathan
Black in New York and record promotional clips with him.  MOORE
wrote, in part and substance, "Guys[,] How do we feel we can
overcome the Jonathan issue…??  'He's on honeymoon…!?!?'" Haddow
responded through the e-mail address renwick@renwickhaddow.com that
the visitors can meet his wife and another Bar Works sales agent
who can "keep them occupied."  MOORE replied, in part: "Ok. Would
be great to find a way to get you involved but equally understand
your reticence[.] We will need a story as to why Jonathon [sic]
isn't there." At approximately the same time, as evident through
other emails between MOORE and Haddow, MOORE knew that Haddow was
on his honeymoon.

        h.    On or about March 20, 2016, JAMES MOORE, the
defendant, and Renwick Haddow discussed the FCA's pending case
against Haddow in an email with the subject line "'F' Word".  MOORE
sent Haddow a link to an FCA website regarding the prosecution of
Haddow's schemes in the U.K., with the note "See you're still
getting plenty of AirPlay from these guys." In subsequent emails
on the same day, MOORE recommended, among other things, that Haddow
hire "great lawyers" and have a "[m]assive distance to special
place (hard to get back)."  Haddow responded, in part and

                              9

substance, "I agree with you totally."

19.   Based on an interview of a Bar Works investor from Utah ("Investor-1"), and review of documents provided by Investor-1, among other things, I have learned the following:

a.   On or about December 5, 2016, Investor-1 invested $500,000 into Bar Works "workspaces" via wire transfer after receiving by email, reviewing, and relying on Bar Works offering materials that included, among other things, the misrepresentations about "Jonathan Black" discussed above.

b.   Investor-1 stopped receiving his minimum payments from Bar Works or its affiliates as of May 2017.

20.   Based on my conversations with Employee-1, review of emails sent by Bar Works to investors, and financial and court records, I have learned Bar Works systematically stopped paying investors their guaranteed payments at least as of about April 2017.

21.   Based on my review of financial records, review of investor correspondence and complaints, and conversations with Bar Works personnel, I have learned that between at least about October 2015 through June 2017, investors committed over $36 million into Bar Works.   In turn, Haddow transmitted at least $18 million from bank accounts associated with Bar Works and its affiliates to bank accounts in over 40 foreign countries, including in China, Cyprus, Morocco, Mauritius, Kuwait, Lebanon, Poland, Thailand, and Turkey, among others.   At least $16 million of that amount was to accounts that received over $100,000 each and are unlikely to represent guarantee payments to individual investors.

22.   Based on my review of internal Bar Works documents, I have learned that between in or about January and May 2016, Agent Company-1 brought in at least 100 investors who commited at least $5 million in investments into Bar Works.

23.   Based on my review of bank records and financial analyses, I have learned that between about November 2015 and May 2016, accounts of a company controlled by JAMES MOORE, the defendant, and his wife received over $1.4 million from Bar Works accounts controlled by Haddow.

WHEREFORE, deponent respectfully requests that a warrant be
issued for the arrest of JAMES MOORE, the defendant, and that he be
imprisoned or bailed, as the case may be.

Angela Tassone
Special Agent
Federal Bureau of Investigation


Sworn to before me this
27th day of August 2018

THE HONORABLE BARBARA MOSES
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK